# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                )
MATI GILL,                      )
                                )
                Plaintiff,      )
                                )
        v.                      )        Civil Action No. 15-2272  (RBW)
                                )
ISLAMIC REPUBLIC OF IRAN,       )
                                )
                Defendant.      )
_____)

## MEMORANDUM OPINION

Mati Gill, the plaintiff in this civil case, brings this personal injury action against the

Islamic Republic of Iran ("Iran") pursuant to the Foreign Sovereign Immunities Act (the "Act"),

28 U.S.C. § 1605A (2012).  Complaint ("Compl.") ¶ 1.  The plaintiff alleges that Iran knowingly

provides material support to Hamas, a Foreign Terrorist Organization, which executed a shooting

attack in Israel during which the plaintiff was shot and injured.  Id.  Currently before the Court is

the plaintiff's Motion for Judgment by Default ("Pl.'s Mot.").  After carefully considering all of

the relevant evidence submitted by the plaintiff,[1] the Court concludes for the reasons below that

it must grant the plaintiff's motion.

## I.  BACKGROUND

The plaintiff filed this action on December 31, 2015, Compl. at 1, asserting a personal

injury claim against Iran under the Act for providing material support to Hamas, which the

---

[1] In addition to the filings identified above, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Memorandum of Law in Support of Motion for Default Judgment, ECF No. 31 ("Pl.'s Mem."); (2) the Declaration of Mati Gill, ECF No. 19-2 ("Gill Decl."); (3) the Declaration of Natan Bar-Chama, M.D., ECF No. 19-3 ("Bar-Chama Decl."); (4) the Declaration of Patrick L. Clawson, Ph.D, ECF No. 25 ("Clawson Decl."); (5) the Declaration of Ronni Shaked, Ph.D, ECF No. 23 ("Shaked Decl."); (6) the Declaration of Gil Erez, ECF No. 20 ("Erez Decl."); (7) Erez Decl., Exhibit ("Ex.") B (CD-ROM); (8) the Deposition of Mati Gill, ECF No. 19-4 ("Gill Dep."); and (9) the Plaintiff's Proposed Findings of Fact and Conclusions of Law in Support of Motion for Default Judgment, ECF No. 27 ("Pl.'s Facts & Law").

plaintiff alleges was responsible for a shooting attack in Israel on April 4, 2008, during which the plaintiff was seriously injured, see id. ¶¶ 1, 8–10, 38–40.  The Clerk of this Court sent by certified mail two copies of the summons, Complaint, and notice of the suit, along with a Farsi translation of each, to the United States Department of State.  See Certificate of Mailing (Jan. 29, 2016), ECF No. 6.  Thereafter, the Secretary of State sent the documents to the Foreign Interests Section of the Embassy of Switzerland in Tehran, which subsequently delivered them to the Iranian Ministry of Foreign Affairs on April 20, 2015.  See Letter from Daniel Klimow, Attorney Adviser in the Department of State's Office of Legal Affairs, to the Clerk of the Court (June 7, 2016), ECF No. 10.  After Iran failed to respond to the action, the plaintiff filed an affidavit in support of a default being entered against Iran, see Affidavit in Support of Default (June 27, 2016), ECF No. 11, and the Clerk of the Court entered a default against Iran on June 28, 2016, see Default (June 28, 2016), ECF No. 12.  The plaintiff then filed his motion for default judgment on July 19, 2016.  See Pl.'s Mot. at 1.

On March 13, 2017, while the plaintiff's motion was pending, the Court issued an Order directing the plaintiff to show cause "why the Court should not dismiss this action for lack of subject-matter jurisdiction," in light of the fact that the plaintiff appeared to assert that the April 4, 2008 shooting attack constituted an extrajudicial killing, but did not "allege[] that any deaths occurred as a result of the shooting."  See Order at 2 (Mar. 13, 2017), ECF No. 30.  The plaintiff timely responded to the Court's Order.  See generally Pl.'s Mem.

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide for the entry of a default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" as provided by the rules. Fed. R. Civ. P. 55(a); see also Jackson v. Beech, 636 F.2d 831,

836 (D.C. Cir. 1980) ("The default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." (quoting <u>H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe</u>, 432 F.2d 689, 691 (D.C. Cir. 1970)).  Rule 55 sets forth a two-step process for a party seeking default judgment: entry of a default, followed by entry of a default judgment.  Fed. R. Civ. P. 55; <u>see also</u> 10A Charles Alan Wright & Arthur R. Miller, <u>Fed. Prac. & Proc. Civ.</u> § 2682 (4th ed. 2017) (stating that "[p]rior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a)").  When a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter a default against that defendant.  <u>See</u> Fed. R. Civ. P. 55(a).  Once the clerk enters the default pursuant to Rule 55(a), Rule 55(b) authorizes either the clerk or the Court to enter a default judgment against the defendant.  <u>See</u> Fed. R. Civ. P. 55(b).

Under the Act, to prevail on a motion for a default judgment against a foreign sovereign, the plaintiff must show that the Court has original jurisdiction over the claim and personal jurisdiction over the defendant, <u>see</u> 28 U.S.C. § 1330(a)–(b), and must "establish[] his claim or right to relief by evidence satisfactory to the [C]ourt," <u>id.</u> § 1608(e); <u>see also</u> <u>Braun v. Islamic Republic of Iran</u>, __ F. Supp. 3d __, __, 2017 WL 79937, at *5 (D.D.C. Jan. 9, 2017) (discussing default judgments under the Act).  This evidence may be presented through sworn affidavits or declarations.  <u>See</u> <u>Belkin v. Islamic Republic of Iran</u>, 667 F. Supp. 2d 8, 20 (D.D.C. 2009).  "Upon evaluation, the Court may accept any uncontroverted evidence presented by plaintiffs as true."  <u>Id.</u> (citing <u>Heiser v. Islamic Republic of Iran</u>, 466 F. Supp. 2d 229, 255 (D.D.C. 2006)).

### III.   FINDINGS OF FACT

Based on the undisputed evidence submitted by the plaintiff, the Court finds that the plaintiff has established the following facts.

### A.   The Attack and the Plaintiff's Injuries

On April 4, 2008, the plaintiff, who was serving as the aide to Avi Dichter, Israel's Minister of Public Security, "accompan[ied] the Minister on a tour he was leading for a Canadian delegation."  Gill Decl. ¶¶ 14–16.  The group stopped at "Nizmit Hill, an elevated observation area, inside Israel, a few hundred meters from the Gaza Border."  Id. ¶ 17.  While at the observation point, the delegation came under gunfire from the direction of the Gaza Strip.  See id. ¶¶ 16–22.  The plaintiff "heard gunshots, and almost immediately felt something hit [his] buttocks and go through [his] leg."  Id. ¶ 19.  He "looked down and saw that the front of [his] khaki pants [were] fill[ed] with blood."  Id. ¶ 20.  The plaintiff then "crawled behind a car to take cover," id. ¶ 22, until an ambulance arrived and took him to a hospital, id. ¶ 23.

███████████████████████████████████████████████████

███████████████████████████████████████ The plaintiff was taken into surgery "to remove as much shrapnel as possible and to attempt to repair the injuries."  Id. ¶ 27; see also Bar-Chama Decl. ¶¶ 16–17.  The plaintiff remained in the hospital for five days, "was in extreme discomfort," and described the experience as "traumatic."  Gill Decl. ¶ 28.

████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████

**B.**      **Iran's Material Support of Hamas's Terrorist Activities**

According to Patrick L. Clawson, Ph.D, the Director of Research at the Washington Institute for Near East Policy and a prior senior research professor at the National Defense University, see Clawson Decl. ¶ 2, "[i]t has been well-documented for over thirty years that Iran has provided funding and training for terrorism operations that targeted United States and Israeli citizens[, and s]uch activities have included support for Hamas," id. ¶¶ 23–24.  "While Iran's relationship with Hamas has waxed and waned over the years, Iran never cut off all its support for Hamas . . . ."  Id. ¶ 27.  "[T]here is ample evidence that Iran has supplied substantial material support to Hamas, including in the period immediately before, during, and immediately after the April 4, 2008 attack in which [the plaintiff] was injured."  Id. ¶ 48.  This support has included

training and financial resources.  See id. ¶¶ 41, 42, 44; see also Bodoff v. Islamic Republic of

Iran, 907 F. Supp. 2d 93, 100–01 (D.D.C. 2012) (finding that "Iran provided substantial support

for Hamas'[s] terrorist activities for the purpose of undertaking attacks such as the February

1996 bus bombing in which [the decedent] was killed, funneled money and material support to

Hamas through [the Iranian Ministry of Information and Security], and also demonstrates that

both defendants played necessary planning, logistical and support roles leading up to the bus

bombing").

        According to Ronni Shaked, Ph.D, who served as a Commander in the Israeli Security

Agency for thirteen years and is the current Head of the Middle East Unit at the Harry Truman

Institute for the Advancement of Peace at Hebrew University, see Shaked Decl. ¶¶ 4, 12, 20,

Hamas is a "deadly and . . . successful" terrorist organization, id. ¶ 21.  Shaked states that

"Hamas considers terrorism, or 'armed resistance'—as it terms its acts of violence—a central

way of attracting attention to itself for the Palestinian public and the Islamic world . . . ." Id.

¶ 22.  Shaked notes that Hamas has "worked with determination to publicize its principal role in

the perpetration of violent attacks against Israelis." Id.  The United States designated Hamas a

Foreign Terrorist Organization in 1997, and it continues to retain that designation.  See Foreign

Terrorist Organizations, U.S. Dep't of State, https://www.state.gov/j/ct/rls/other/des/123085.htm

(last visited Mar. 21, 2017).

## C.     Hamas's Responsibility for the Attack

        "[F]or many years, Hamas worked with determination to publicize its principal role in the

perpetration of violent attacks . . . [and] its public recognition of its operatives when they died or

were arrested."  Shaked Decl. ¶ 22.  "[W]hen Hamas makes an official claim of responsibility for

an attack, the claim has usually been accurate."  Id. ¶ 24.  According to Gil Erez, a former

military intelligence officer for the Israeli Defense Forces with a specialty in aerial photo analysis, <u>see</u> Erez Decl. ¶¶ 4–5, on the day of the attack, "Hamas claimed responsibility for the [a]ttack in a news flash on Al Aqsa TV, Hamas's Gaza-based television station," <u>id.</u> ¶ 33.  Also that same day, the spokesperson for the Qassam Brigades, Hamas's military arm, claimed that the Qassam Brigades and another group called Defenders of Al Aqsa were jointly responsible for the attack.  <u>See id.</u> ¶¶ 15, 33; <u>see also</u> Shaked Decl. ¶¶ 59–65.  Qassam Brigade's website includes the attack on its list of successful attacks, and specifies that the attack targeted Minister Dichter's convoy.  <u>See</u> Erez Decl. ¶¶ 34 & n.17; Shaked Decl. ¶¶ 60, 68.

 Further, "[i]n recent years, Hamas has begun to film some of its attacks on Israeli targets for internal propaganda purposes."  Shaked Decl. ¶ 30.  The Qassam Brigades recorded and publicized a video of the attack that is the subject of this case on April 4, 2008.  <u>See</u> Erez Decl. ¶ 34.  On that day, "a video was broadcast on Al Aqsa TV showing the [a]ttack from the perspective of the perpetrators, including how the shooter prepared and settled in, aimed toward the people on the hill and shot several rounds."  <u>Id.</u> ¶ 34; <u>see also</u> <u>id.</u>, Ex. B (CD-ROM); Shaked Decl. ¶¶ 74–80.

## IV.    CONCLUSIONS OF LAW

### A.    Original Jurisdiction

The Act provides that "district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state," so long as the claim for relief is "in personam with respect to which the foreign state is not entitled to immunity."  28 U.S.C. § 1330(a).  Here, although the plaintiff requested a jury trial, <u>see</u> Compl. at 9, claims under the Act are not subject to jury trials, <u>see</u> <u>Braun</u>, __ F. Supp. 3d at __, 2017 WL 79937, at *5 ("[W]hile the plaintiffs have demanded 'trial by jury of all issues legally triable to a jury' no

jury trial is available for . . . claims [under the Act], and thus this action is a 'nonjury civil

action.'" (internal citations omitted)).  Additionally, the plaintiff brings this action against Iran as

a foreign sovereign for in personam relief.  <u>See</u> Compl. ¶¶ 1, 13.  Therefore, this action is a

"nonjury civil action," and the claim for relief is "in personam."  <u>See</u> <u>Braun</u>, __ F. Supp. 3d at

__, 2017 WL 79937, at *5.  Thus, the Court must initially determine whether the foreign state is

"entitled to immunity."  28 U.S.C. § 1330(a).

## B.      Waiver of Sovereign Immunity

The Act provides exceptions to the grant of sovereign immunity generally accorded to

foreign states.  <u>See generally</u> 28 U.S.C. § 1605A (entitled "Terrorism exception to the

jurisdictional immunity of a foreign state").  The terrorism exception provides that a district

court has jurisdiction to hear a claim against a foreign state if, in addition to other scenarios not

applicable in this case, (1) that "state was designated as a state sponsor of terrorism" at the time

of the act that is the subject of the action and retains that designation at the time the claim is

filed, <u>id.</u> § 1605A(a)(2)(A)(i)(I); (2) the claimant was a United States national at the time of the

act, <u>id.</u> § 1605A(a)(2)(A)(ii)(I); and (3) the foreign state provided material support or resources

for "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," which caused

the personal injury or death that is the subject of the action, <u>id.</u> § 1605A(a)(1).[2]

The first two elements of the terrorism exception are clearly satisfied in this case.  First,

Iran was designated as a state sponsor of terrorism at the time of the attack on April 4, 2008, <u>see</u>

22 C.F.R. § 126.1(d) (2008), and when the plaintiff filed his Complaint in 2015, <u>see</u> <u>id.</u>

§ 126.1(d) (2015); <u>see also</u> <u>State Sponsors of Terrorism</u>, U.S. Dep't of State,

---

[2] The fourth requirement, which requires the plaintiff to "afford[] the foreign state a reasonable opportunity to arbitrate the claim," does not apply because the attack that is the subject of this action did not "occur[] in the foreign state against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).

https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 21, 2017) (stating that Iran was

designated as a State Sponsor of Terrorism on January 19, 1984, and currently retains that

designation).  Second, the plaintiff was a United States citizen at the time of the attack.  See Gill

Decl. ¶ 4 (stating that he is a dual citizen of the United States and Israel).

The last element of the terrorism exception applicable to this case requires the plaintiff to

prove that (1) the foreign state provided material support or resources (2) for "an act of torture,

extrajudicial killing, aircraft sabotage, [or] hostage taking," which (3) caused the personal injury

or death that is the subject of the action.   28 U.S.C. § 1605A(a)(1).  The Court is satisfied that

the plaintiff has demonstrated that Iran provides material support for Hamas's terrorist activities,

such as the April 4, 2008 attack that is the subject of this case, see supra Part III.B, and that

Hamas is responsible for that attack, which caused the plaintiff's injuries, see supra Part III.A, C.

"This evidence satisfies the [Act's] requirement of a causal connection between the act or

omission of [Iran] and the damages which the plaintiff[] ha[s] suffered."  Bodoff, 907 F. Supp.

2d at 101; see also Cohen v. Islamic Republic of Iran, __ F. Supp. 3d __, __, No. 12-cv-1496

(CRC), 2017 WL 818208, at *5 (D.D.C. Mar. 1, 2017) ("[W]here a foreign state routinely

funnels money to a terrorist organization, a plaintiff need not establish that the material support

or resources . . .  contributed directly to the act from which the claim arises to satisfy his

obligation under the [Act]." (quoting Valencia v. Islamic Republic of Iran, 774 F. Supp. 2d 1, 12

(D.D.C. 2010))).

The question that remains regards the second prerequisite; namely, whether the attack

constitutes "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking."  28

U.S.C. § 1605A(a)(1).  Upon consideration of the text and history of the terrorism exception, the

Court agrees with the plaintiff that the attack that injured him qualifies as an attempted

extrajudicial killing, which is included in the terrorism exception's definition of extrajudicial killing.  See Pl.'s Mem. at 1.

The Court relies in part on another member of this Court's comprehensive historical analysis of the terrorism exception as set forth in In re Islamic Republic of Iran Terrorism Litigation, 659 F. Supp. 2d 31 (D.D.C. 2009).  In that case, (then Chief) Judge Lamberth noted that "[t]he state sponsor of terrorism exception of the [Act] was first enacted in 1996, . . . [but] the original exception at § 1605(a)(7) was repealed [in 2008] by the 2008 [National Defense Appropriations Act], and replaced with a new exception at § 1605A."  Id. at 39.  The original terrorism exception eliminated foreign sovereign immunity in cases

> in which money damages [we]re sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . .

28 U.S.C. § 1605(a)(7) (repealed 2008).  And, the Act, when first enacted, adopted the definitions of "torture" and "extrajudicial killing" provided by the Torture Victims Protection Act of 1991.  See id. § 1605(e)(1).

Judge Lamberth noted that "[t]he new terrorism exception—§ 1605A—clear[ed] away a number of legal obstacles, including adverse court rulings, that ha[d] stifled plaintiffs' efforts to obtain relief in civil actions against designated state sponsors of terrorism."  In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d at 40.  Specifically, § 1605A (1) created a new federal cause of action against state sponsors of terrorism, (2) allowed for punitive damages under the new cause of action, (3) authorized compensation for special masters, and (4) "implement[ed] new measures designed to facilitate the enforcement of judgments."  Id. at 58–59.

The District of Columbia Circuit has come to a similar conclusion regarding the terrorism exception's objective, noting in Han Kim v. Democratic People's Republic of Korea that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices."  774 F.3d 1044, 1048 (D.C. Cir. 2014).  On that point, the Circuit continued:

> Concerned with victims' inability to obtain redress in terrorism cases, Congress later amended the statute to make it easier to attach a foreign State's property during litigation and to seize those assets to satisfy a judgment.  See 28 U.S.C. §§ 1605A(g), 1610.  And the statute has always authorized courts to enter default judgments against defendants who refuse to appear.  Id. § 1608(e).  With these provisions, Congress aimed to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.

Han Kim, 774 F.3d at 1048.  In another case brought under the Act, after recounting the terrorism exception's history, see Van Beneden v. Al-Sanusi, 709 F.3d 1165, 1167 (D.C. Cir. 2013), the Circuit concluded that, given the Act's "text and purpose," its "ambiguities [should be interpreted] flexibly and capaciously," id. at 1167 –68 & n.4 (citing with approval Doe v. Bin Laden, 663 F.3d 64, 70 (2d Cir. 2011), which stated that "[t]he text, history, and purpose of the statute make clear that the statute does not counsel a narrow reading").

In In re Islamic Republic of Iran Terrorism Litigation, Judge Lamberth noted that, although the current terrorism exception removed certain legal barriers for plaintiffs to pursue relief against state sponsors of terrorism, its "grant of subject[-]matter jurisdiction for suits against state sponsors of terrorism is virtually unchanged" from the original terrorism exception. 659 F. Supp. 2d at 39.  The current terrorism exception in § 1605A provides, in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act

or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A (2012).  Congress continued to define the terms "torture" and "extrajudicial killing" for purposes of § 1605A as they are defined in the Torture Victims Protection Act of 1991.  See 28 U.S.C. § 1605A(h)(7).

> The Torture Victims Protection Act defines an extrajudicial killing as
>
> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

106 Stat. 73, 28 U.S.C. § 1350 (note).  The Torture Victims Protection Act amended the Alien Tort Statute, which grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  And the Alien Tort Statute "confers a jurisdictional grant for a 'narrow set of common law actions derived from the law of nations.'"  Ali Shafi v. Palistinian Auth., 686 F. Supp. 2d 23, 26 (D.D.C. 2010) (quoting Sosa v. Alvarez-Machain, 542 U.S. 692, 721 (2004)).  A former judge of this Court summarized the purpose underlying the Torture Victims Protection Act as follows:

> After a federal circuit judge expressed doubt that such a judicially-created cause of action was appropriate, see Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 813 (D.C. Cir. 1984) (Bork, J., concurring) (questioning the propriety of finding that "a rule has evolved against torture by government so that our courts must sit in judgment of the conduct of foreign officials in their own countries with respect to their own citizens"), Congress passed the [Torture Victims Protection Act].  See S. Rep. 102–249, at 4–5 (1991) ("Judge Robert H. Bork questioned the existence of a private right of action under the [Alien Tort Statute], reasoning that separation of powers principles required an explicit grant by Congress of a private right of action for lawsuits which affect foreign relations. The [Torture Victims Protection Act] would provide such a grant[.]" (citing Tel-Oren )). The [Torture Victims Protection Act] provides, in relevant part, that "[a]n individual who, under actual or apparent

authority, or color of law, of any foreign nation ... subjects an individual to torture shall, in a civil action, be liable for damages to that individual[.]"  28 U.S.C. § 1350. The Supreme Court cited the [Torture Victims Protection Act] as an example of a clear Congressional mandate for creating a cause of action for claims of torture and extrajudicial killing . . . .

Ali Shafi, 686 F. Supp. 2d at 26.  To summarize, Congress passed the Torture Victims Protection Act in order to create an explicit federal cause of action for plaintiffs to bring claims of torture and extrajudicial killing against foreign states to ensure that federal courts would have original jurisdiction over such claims under the Alien Tort Statute.  See id.  Accordingly, the purposes of the Torture Victims Protection Act and the terrorism exception are similar, in that Congress passed both statutes in order to aid victims in their pursuit to prosecute claims of particular types of torture and terrorism against foreign states.

The plaintiff has not identified any case, nor could the Court find any, in which a court concluded that the terrorism exception creates a waiver of a foreign state's sovereign immunity against a claim for extrajudicial killing in circumstances where no fatalities actually resulted.[3] Two courts have determined, however, that the definition of an extrajudicial killing under the Torture Victims Protection Act includes liability for an attempted extrajudicial killing.  In Warfaa v. Ali, 33 F. Supp. 3d 653 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016), petition for cert. filed, (U.S. May 2, 2016) (No. 15-1345), a member of the Eastern District of Virginia declined to grant the defendant's motion to dismiss the plaintiff's Torture Victims Protection Act claims, concluding that the plaintiff sufficiently pleaded claims of torture and attempted extrajudicial killing under the Torture Victims Protection Act because the plaintiff "describe[ed]

---

[3] In his memorandum, the plaintiff cites and Buonocore v. Great Socialist People's Libyan Arab Jamahiriya, No. CIV.A. 06-727 JMF, 2013 WL 351546 (D.D.C. Jan. 29, 2013); Haim v. Islamic Republic of Iran, 784 F. Supp. 2d 1 (D.D.C. 2011); and Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15 (D.D.C. 2008).  See Pl.'s Mem. at 4.  In each of these cases, however, the terrorist attack resulted in fatalities.  See Buonocore, 2013 WL 351546 at *7, 10, 12; Haim, 784 F. Supp. 2d at 4; Acosta, 574 F. Supp. 2d at 18.

in graphic detail the nature of the torture he endured <u>and</u> [the] defendant's 'deliberated' attempt to kill him without process," <u>id.</u> at 657, 666 (emphasis added); <u>see also id.</u> at 666 (noting that the "defendant personally participated in [the] plaintiff's torture and further attempted to kill him by shooting him five times").[4]   Similarly, in <u>Doe v. Constant</u>, No. 04 Civ. 10108 (SHS) (S.D.N.Y. Oct. 24, 2006), <u>aff'd</u>, 354 Fed. App'x 543 (2d Cir. 2009), a judge of the Southern District of New York entered a default judgment against the defendant after finding that liability for extrajudicial killing under the Torture Victim Protection Act "ha[d] been clearly established" where the plaintiffs were victims of "attack[s] that were attempts to kill them," even though the plaintiffs survived the attacks, <u>see id.</u> at 9 n.3.   In both <u>Warfaa</u> and <u>Constant</u>, the plaintiffs asserted attempted extrajudicial killing and torture as <u>separate</u> claims, and the courts in both cases evaluated the claims of attempted extrajudicial killing independently of the torture claims. <u>See</u> <u>Warfaa</u>, 33 F. Supp. 3d at 666 (concluding that the plaintiff "alleged both offending acts with requisite specificity, describing in graphic detail the nature of the torture he endured <u>and</u> [the] defendant's 'deliberated' attempt to kill him without process" (emphasis added)); <u>Constant</u>, No. 04 Civ. 10108 (SHS) at 9 n.3 (concluding, after determining that the plaintiffs adequately pleaded a claim for torture, that "[a]dditionally, plaintiff Jane Doe I was the victim of a brutal stabbing and Jane Doe III the victim of an attack that were attempts to kill them.   As such, liability has been clearly established for attempted extrajudicial killing" (emphasis added)). Accordingly, the courts' holdings in <u>Warfaa</u> and <u>Constant</u> regarding a claim for attempted

---

[4] This holding regarding the attempted extrajudicial killing is not what is being challenged in the plaintiff's petition for a writ of certiorari.   <u>See</u> Petition for Writ of Certiorari at (i), <u>Warfaa</u>, No. 15-1345 (U.S. May 2, 2016) (stating that the plaintiff's question presented concerns "[w]hether a foreign official's common-law immunity for acts performed on behalf of a foreign state is abrogated by [the] plaintiff's allegations that those official acts violated <u>jus cogens</u> norms of international law").

extrajudicial killing did not depend on the fact that the plaintiffs were also tortured or that a third party was killed.

This Court is persuaded by the Warfaa and Constant rulings that the Torture Victim Protection Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt. See Warfaa, 33 F. Supp. 3d at 666; Constant, No. 04 Civ. 10108 (SHS) at 9 n.3. Therefore, because the terrorism exception adopts the Torture Victim Protection Act's definition of extrajudicial killing for the purposes of determining whether a foreign state has waived its sovereign immunity for particular categories of terrorism, see 28 U.S.C. § 1605A(a)(1), (h)(7), the Court concludes that Hamas's attempted extrajudicial killing of the plaintiff constitutes an extrajudicial killing under the terrorism exception. In reaching this conclusion, the Court is guided by the Circuit's direction that Congress amended the terrorism exception to "prevent state sponsors of terrorism . . . from escaping liability for their sins," Han Kim, 774 F.3d at 1048, and therefore, given the Act's "text and purpose," its "ambiguities [should be interpreted] flexibly and capaciously," Van Beneden, 709 F.3d at 1167 & n.4; see also Cohen, __ F. Supp. 3d at __, 2017 WL 818208 at *5 ("For purposes of subject matter jurisdiction, [the p]laintiffs need only establish that the bombing here was unauthorized, deliberate, and that there were casualties. It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply."). Accordingly, because (1) Iran was designated as a state sponsor of terrorism in 2008 and 2015; (2) the plaintiff is a United States citizen; and (3) Iran provided material support for Hamas, which committed the attempted extrajudicial killing of the plaintiff, the Court concludes that Iran's sovereign immunity is waived based on the terrorism exception.

C.      **Personal Jurisdiction**

"Personal jurisdiction over a foreign state shall exist as to every claim of relief over which the district courts have jurisdiction . . . where service has been made under [§] 1608 of this title." 28 U.S.C. § 1330(b).  Thus, because subject-matter jurisdiction has already been established, see supra Part III.A–B, the Court must determine whether the plaintiff has properly effected service pursuant to § 1608.

Section 1608 provides several means of serving a foreign state.  One acceptable method is serving the foreign state "through diplomatic channels," which requires the plaintiff to send "two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state."  Id. § 1608(a)(4).  The copies may be sent "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court" in order to have the copies sent through "diplomatic channels" to the foreign state.  Id. The clerk of the court shall receive "a certified copy of the diplomatic note indicating when the papers were transmitted."  Id.

Here, the plaintiff properly made effective service through diplomatic channels because the Clerk of the Court sent by certified mail "two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state," id. § 1608(a)(4), to the Secretary of State, see Certificate of Mailing (Jan. 29, 2016), ECF No. 6, who then delivered the forms to Iran by sending them to the Foreign Interests Section of the Embassy of Switzerland in Tehran, which subsequently delivered them to the Iranian Ministry of Foreign Affairs on April 20, 2015, see Letter from Daniel Klimow, Attorney Adviser in the Department of State's Office of Legal Affairs, to the Clerk of the Court (June 7, 2016), ECF No. 10.  The Secretary of State then "sen[t] to the clerk of the court a certified copy of the diplomatic

note indicating when the papers were transmitted," 28 U.S.C. § 1608(a)(4), <u>see</u> Letter from Daniel Klimow, Attorney Adviser in the Department of State's Office of Legal Affairs, to the Clerk of the Court (June 7, 2016), ECF No. 10.  Accordingly, the plaintiff complied with all of the required steps of Section 1608(a)(4) for serving process on Iran.

Therefore, because the Court has valid subject-matter jurisdiction over the action, and the plaintiff properly served Iran through diplomatic channels, the Court has personal jurisdiction over Iran.  <u>See</u> <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 69–70 (D.D.C. 2010) (concluding that the court had personal jurisdiction under the Act because "the clerk dispatched the documents, and the Secretary of State transmitted one copy of the documents to Iran via a diplomatic note though the Embassy of the Swiss Confederation while returning the other copy to the clerk.  Plaintiffs therefore properly served defendants under § 1608(a)(4).").

**D.      Iran's Liability for the Plaintiff's Personal Injury**

The Act provides a private right of action against a state sponsor of terrorism for personal injury caused by an extrajudicial killing.  <u>See</u> 28 U.S.C. § 1605A(c).  "[A] foreign state shall be vicariously liable for the acts of its officials, employees, or agents."  <u>Id.</u>  Here, the plaintiff alleges that he "was seriously injured by Hamas, whose operatives committed a willful, wrongful and intentional act constituting both an assault and battery upon his person, causing injury to him," Compl. ¶ 38,[5] and that Iran is vicariously liable for Hamas's actions under a theory of civil conspiracy, <u>see</u> Pl.'s Facts & Law ¶¶ 54–56.

---

[5] The plaintiff pleaded a single claim under the Act, <u>see</u> Compl. at 8, but the Court treats the plaintiff's allegations of assault and battery as two distinct claims.  <u>See, e.g.</u>, <u>Braun</u>, __ F. Supp. 3d at __, 2017 WL 79937, at *9 (treating battery and assault as two separate claims); <u>Valore</u>, 700 F. Supp. 2d at 76–77 (addressing assault and battery separately).

### 1.      Civil Conspiracy

The elements of civil conspiracy consist of: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 27 (D.D.C. 2008) (citing Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)).

Other members of this Court have held that "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." Id. (quoting Bodoff, 424 F. Supp. 2d at 84). Here, the plaintiff has provided sufficient evidence for the Court to conclude that Iran's support of Hamas through "funding and training for terrorism activities that targeted United States and Israeli citizens," Clawson Decl. ¶¶ 23–24, constituted an agreement to commit terrorist acts, see Shaked Decl. ¶ 22 ("[F]or many years, Hamas worked with determination to publicize its principal role in the perpetration of violent attacks against Israelis."), like the April 4, 2008 shooting attack that injured the plaintiff, see Gill Decl. ¶¶ 16–22; Erez Decl. ¶¶ 15, 33, 34. Accordingly, the plaintiff has established the elements of a civil conspiracy between Iran and Hamas, and thus has provided a basis of Iran's vicarious liability.[6]

### 2.      Assault

"Although [§] 1605A(c) provides a private right of action, it provides no guidance on the substantive bases for liability to determine [a] plaintiff['s] entitlement to damages. Consequently, courts have applied 'general principles of tort law,' such as the Restatement (Second) of Torts, to determine liability." Braun, __ F. Supp. 3d at __, 2017 WL 79937, at *8

---

[6] The plaintiff alleges that Iran is also vicariously liable for Hamas's actions under theories of inducement and aiding and abetting. See Pl.'s Facts & Law ¶¶ 53, 57. Because the Court concludes that Iran is vicariously liable under a theory of civil conspiracy, it need not address these alternative theories.

(citing Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 24 (D.D.C. 2009)); see also Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 399 (D.D.C. 2015); Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).  Consistent with the approach taken by its colleagues, which the Court finds convincing, the undersigned will also evaluate the plaintiff's claims of assault and battery under the principles adopted by the Restatement (Second) of Torts.

Under the Restatement, Iran is liable for assault if, through its material support of Hamas, see 28 U.S.C. § 1605A(a)(1), Iran "act[ed] intending to cause a harmful or offensive contact with the person . . . or [to cause] an imminent apprehension of such a contact, and the other is thereby put in such imminent apprehension."  Restatement (Second) of Torts § 21(1) (Am. Law Inst. 1965).  The objective of terrorism is to use violence and fear to achieve political means.  See Terrorism, Black's Law Dictionary (10th ed. 2014) (defining terrorism as "[t]he use or threat of violence to intimidate or cause panic, esp[ecially] as a means of achieving a political end"); see also 22 U.S.C. § 2656f(d) (defining "terrorism" as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents").

Other members of this Court have held that acts of terrorism constitute assault under the Act.  For example, in Valore, the Court held that Iran and its Ministry of Information and Security were liable under the Act for assault for the 1983 bombing of the United States Marine barracks in Beirut, Lebanon.  700 F. Supp. 2d at 57, 76.  The Court in Valore concluded:

> It is clear that [the] defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm.  Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, the Court concludes that [the] defendants are liable for assault.

Id. at 76; see also Braun, __ F. Supp. 3d at __, 2017 WL 79937, at *9 (noting that a terrorist attack is "intended to cause harm or, at least, fear of such harm among those targeted"). Moreover, the plaintiff has asserted that the attack was a "traumatic event[]," Gill Decl. ¶ 35, thus satisfying the requirement of assault that he was put in imminent apprehension of harm, see Restatement (Second) of Torts § 21(1). Accordingly, the plaintiff has provided sufficient evidence to demonstrate that Iran is liable for assault because it provided material support to Hamas, see Clawson Decl. ¶ 48, which, by committing the April 4, 2008 attack, see Erez Decl. ¶ 33, "intend[ed] to cause a harmful or offensive contact with the [plaintiff] . . . or [to cause] an imminent apprehension of such a contact, and the [plaintiff] [wa]s thereby put in such imminent apprehension," Restatement (Second) of Torts § 21(1).

3.      **Battery**

Iran is liable for battery if, through the material support of Hamas, see 28 U.S.C. § 1605A(a)(1), Iran "act[ed] intending to cause a harmful or offensive contact . . . or [to cause] an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 13 (Am. Law Inst. 1965). "Again, it is clear that [Iran, through material support provided to Hamas,] acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm." Valore, 700 F. Supp. 2d at 77. Additionally, the plaintiff has sufficiently demonstrated that harmful contact resulted from the actions of Hamas, because he suffered severe injuries as a result of the attack.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████  Based on this

evidence, the plaintiff has demonstrated that Iran is liable for the plaintiff's injuries caused by the

tort of battery, because it provided material support to Hamas, which committed the attack that

caused the intended harmful contact, and the plaintiff was injured as a result of the attack.  See

Restatement (Second) of Torts § 13.  Accordingly, the Court concludes that Iran is liable for

battery.

## E.     Damages

"The [Act] specifically permits plaintiffs suing under [ ] § 1605A to pursue 'economic

damages, solatium, pain and suffering[,] and punitive damages.'"  Acosta, 574 F. Supp. 2d at 29

(quoting 28 U.S.C. § 1605A).  Here, the plaintiff is requesting $10 million in compensatory

damages, see Compl. at 8, for his "physical injury and extreme mental anguish and pain and

suffering," id. ¶ 40, as well as $30 million in punitive damages,[7] see id. at 8, based on his

allegation that the attack "constituted a threat to the public at large," id. ¶ 41.[8]

### 1.     Compensatory Damages

"[C]ourts may look to expert testimony and prior awards for comparable injury" to

determine the appropriate amount of compensatory damages.  Braun, __ F. Supp. 3d at __, 2017

WL 79937, at *11 (citing Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 214 (D.D.C.

---

[7] In his Complaint, the plaintiff seeks $30 million in punitive damages, Compl. at 8, but in his Proposed Findings of Fact and Conclusions of Law, the plaintiff seeks $150 million in punitive damages, Pl.'s Facts & Law ¶ 64.  The plaintiff also seeks prejudgment interest in his Proposed Findings of Fact and Conclusions of Law, id. ¶ 65, but he did not request this relief in his Complaint, see generally Compl.  "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c); see also Salmeron v. District of Columbia, 77 F. Supp. 3d 201, 212 (D.D.C. 2015) (Walton, J.) (denying the plaintiffs' request in their Memorandum in Support of their Motion for Default Judgment for "a penalty for late payment of attorneys' fees [because it] is not requested in either the Complaint or the Amended Complaint"), vacated on other grounds, (D.D.C. 2015) (Walton, J.).  Accordingly, this Court can consider only the damages requested in the plaintiff's Complaint.

[8] The plaintiff also requested "any and all costs . . . including attorneys' fees," Compl. at 9, but § 1605A does not provide for this award, see 28 U.S.C. § 1605A(c) (only allowing recovery of "economic damages, solatium, pain and suffering, and punitive damages").

2012)).  In making such awards, courts have made "an assessment of such factors as 'the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life.'"  Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 48 (D.D.C. 2012) (quoting Valore, 700 F. Supp. 2d at 83–84).  And, "[i]n awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards."  Id. (quoting Valore, 700 F. Supp. 2d at 84).

In Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 51 (D.D.C. 2007), "the Court granted a baseline award of $5 million to individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as 'lasting and severe psychological pain.'"  Valore, 700 F. Supp. 2d at 84 (quoting Peterson, 515 F. Supp. 2d at 54).  "The [Patterson] Court was willing to depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead . . . ."  Id. (quoting Peterson, 515 F. Supp. 2d at 54).  "Similarly, the Court [in Patterson] was willing to depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire."  Id. (citing Peterson, 515 F. Supp. 2d at 54).

In determining the amount of damages for pain and suffering that should be awarded in this case, the Court has considered several cases in which compensatory damages were awarded under the Act to compare the injuries and the amounts of compensatory damages that were awarded.  For example, plaintiffs were awarded $9 to $10 million in compensatory damages in cases where the victims were held as hostages and tortured for extensive periods of time, see,

e.g., Cicippio v. Islamic Republic of Iran, 18 F. Supp. 2d 62, 64–65, 70 (D.D.C. 1998) (awarding

one plaintiff $9 million in damages after he was kidnapped, held hostage, and extensively

tortured for 532 days), or sustained severe injuries that ultimately led to a person's death, see,

e.g., Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 17–18, 22–23 (D.D.C. 2002)

(awarding the administrators of the victim's estate $10 million in damages for pain and suffering

after a terrorist attack that caused the victim's skin to "literally rip[] from his body," and he

sustained second to fourth degree burns on approximately one third of his body, experienced

respiratory failure, had tubes inserted into his chest, needed to use a ventilator, and endured a

multitude of other severe complications because of the attack until ultimately dying as a result of

his injuries).  The injuries, pain, and suffering that merited $9 to $10 million in compensatory

damages in Cicippio and Weinstein are far more severe than the plaintiff's injuries, pain, and

suffering in this case, and therefore merit an award of damages in a lesser amount.

The plaintiff's injuries, pain, and suffering are more similar to the surviving plaintiffs'

injuries and pain and suffering proven in Harrison.  See 882 F. Supp. 2d at 35–44.  The plaintiffs

in Harrison were military personnel serving on a United States naval ship, the U.S.S. Cole, in the

Port of Aden, Yemen, when "a small boat manned by two men pulled up parallel to the ship.

Seconds later, the boat exploded."  Id. at 31.  "[T]he blast and its after-effects killed seventeen

[N]avy sailors, and forty-two others were injured."  Id.  Several of the injured Navy members

brought the action in Harrison.  See id. at 35–44.

Based on the $5 million baseline for compensatory damages established by Peterson, 515

F. Supp. 2d at 54, the Court in Harrison awarded three plaintiffs $7.5 million each for their pain

and suffering.  882 F. Supp. 2d at 48–49.  One of those plaintiffs, Margaret Lopez, was working

in the oil lab at the time of the blast.  See id. at 37.  "As a direct result of the blast, [ ] Lopez

sustained burns to her face, neck, legs, and arms; her ear drums were ruptured; and several discs in her spine were ruptured." Id. at 38. After the blast, the oil lab began to flood so Lopez "freed herself from debris and jumped into the sea through a hole created by the blast," and "remained in the water for over an hour before being pulled to safety." Id. She then "remained . . . under the care of a burn specialist" for two weeks. Id. Further, "while waiting to get a skin graft, [ ] Lopez developed pneumonia." Id. She also had eardrum replacement surgery and suffered emotional and psychological injuries, such as post-traumatic stress disorder, insomnia, mood swings, and nightmares. See id.

Another plaintiff in Harrison, Jeremy Stewart, was "thrown to the ground and suffered a concussion, los[t] consciousness for five to fifteen minutes," and then lost consciousness again for "approximately one week." Id. at 41. "As a result of the blast, [ ] Stewart suffered multiple fractures and shattered bones in his arms and legs, a gastric rupture, internal bleeding, and shrapnel wounds." Id. 41–42. Additionally, "[h]is injuries caused permanent scarring on his forearms, knees, legs, and stomach," and "[h]e is no longer able to run and has lost range of motion in his right shoulder, and endures constant pain on a daily basis." Id. at 42. Stewart also suffered emotional and psychological injuries such as "sadness, flashbacks, nightmares, irritability, and high anxiety." Id.

The other Harrison plaintiff who received $7.5 million in compensatory damages for pain and suffering, John Buckley, was "flung . . . through the air to the other end of the passageway, where he had a concussion and lost consciousness." Id. at 37. Buckley "suffered fractures to both knees, hearing loss, and severe lower back trauma. [He] continues to suffer from his physical injuries." Id. Buckley also "cannot lift over 100 pounds, has undergone two back surgeries, and continues to receive treatment for his knee injuries." Id. Further, Buckley

suffered emotional and psychological injuries such as "nightmares and headaches, [and he] is prone to aggressive behaviors, and hears voices." Id.

The plaintiff's physical injuries and pain and suffering are similar to those sustained by the three Harrison plaintiffs because his injuries caused him to experience trauma and severe discomfort immediately after the attack, see Gill Decl. ¶¶ 28, 30, and will have lifelong effects, see Bar-Chama Decl. ¶ 22. The plaintiff's injuries, however, do not rise to the level of injury caused by torture or death, which have merited compensatory damages awards in the range of $9 to $10 million. See Weinstein, 184 F. Supp. 2d at 22–23; Cicippio, 18 F. Supp. 2d at 64–65, 70. Accordingly, the Court will award the plaintiff $7.5 million in compensatory damages.

### 2. Punitive Damages

Under the Act, a state sponsor of terrorism may be held liable for punitive damages. See 28 U.S.C. § 1605A(c). The purpose of punitive damages is to "punish [the defendant] for [its] outrageous conduct and to deter [it] and others like [it] from [engaging in] similar conduct in the future." Restatement (Second) of Torts § 908(1). Further, punitive damages may be awarded "for conduct that is outrageous, because of the defendant's evil motive or [its] reckless indifference to the rights of others." Id. Here, the Court finds that Iran's actions are sufficiently outrageous to support an award of punitive damages because its "demonstrated policy of encouraging, supporting and directing a campaign of . . . terrorism is evidence of the monstrous character of the [attack] that inflicted . . . pain and suffering on [an] innocent pe[rson]." Valore, 700 F. Supp. 2d at 88.

Moreover, "[p]unitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of

American citizens and others.'"  Braun, __ F. Supp. 3d at __, 2017 WL 79937, at *14 (citing

Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48, 85 (D.D.C. 2011)).  The

Court agrees with another member of this Court's conclusion that Iran's "support[] [of] Hamas

justifies the imposition of punitive damages here."  Id.; see also Acosta, 574 F. Supp. 2d at 30–

31 (concluding that punitive damages were warranted to punish Iran for its material support of

terrorist groups).

"[C]ourts in similar cases have generated two numbers that, together, determine the

punitive damages award: (1) the multiplicand and (2) the multiplier . . . ."  Harrison, 882

F. Supp. 2d at 50.  "[T]he multiplicand is either the magnitude of the defendant's annual

expenditures on terrorist activities or the amount of compensatory damages already awarded."

Id.  Here, Clawson states that Iran pledged $250 million to Hamas for 2006 through 2007, see

Clawson Decl. ¶ 36, and Iran "decided to increase its financial support for Hamas to $150

million for the second half of 2008," id. ¶ 44.  The approach of using Iran's annual expenditures

on terrorist activities, "which may result in awards of billions of dollars, has been used in the

case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut,

which killed 241 American military servicemen."  Braun, __ F. Supp. 3d at __, 2017 WL 79937,

at *14.  The attack here was not an "exceptionally deadly attack," as there were no deaths, see

Pl.'s Facts & Law ¶ 48, and so far as the Court is aware, the only resulting injuries were the

injuries sustained by the plaintiff.  Accordingly, the Court will utilize a multiplicand in the same

amount as the compensatory damages awarded—$7.5 million.

"The multiplier [other members of this Court have used] has ranged between three and, in

exceptional cases, five."  Harrison, 882 F. Supp. 2d at 50.  Here, the plaintiff requests a punitive

damages award of $30 million, which would require use of a multiplier of four.  In Harrison,

however, three of the plaintiffs suffered similar injuries that also merited a compensatory damages award of $7.5 million, see 882 F. Supp. 2d at 48–49, and the Harrison Court used a multiplier of three to determine punitive damages because it "f[ound] no exceptional circumstances," id. at 50.  Similarly, because the Court finds no exceptional circumstances in this case, it will use a multiplier of three, and award the plaintiff $22.5 million in punitive damages.

## IV.   CONCLUSION

The Court concludes that it has original jurisdiction under the Foreign Sovereign Immunities Act because Iran is a state sponsor of terrorism, the plaintiff is a citizen of the United States, and Iran waived its sovereign immunity under the terrorism exception by providing material support to Hamas, a Foreign Terrorist Organization, which attempted the extrajudicial killing of the plaintiff.  The Court has valid personal jurisdiction over Iran because the Court has valid subject-matter jurisdiction over this action, and the plaintiff properly effected service under the Act.  The plaintiff provided sufficient evidence to establish that Iran is vicariously liable for assault and battery under the Act because it engaged in a civil conspiracy with Hamas to commit terrorist activities, and Hamas is responsible for the attempted extrajudicial killing that injured the plaintiff.  Accordingly, based on the nature and extent of the plaintiff's injuries, coupled with the pain and suffering he has endured, the plaintiff is entitled to $7.5 million in compensatory damages, and Iran's support of terrorism warrants a punitive damages award of $22.5 million. For the foregoing reasons, the plaintiff's motion for entry of default judgment is granted, and damages are awarded in the amount of $30 million.

**SO ORDERED** this 31st day of March, 2017. [9]

REGGIE B. WALTON
United States District Judge

---

[9] An Order will be issued contemporaneously with this Memorandum Opinion.